ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Vision Distributors LLC | ) ASBCA No. 64357 |
| | ) |
| Under Contract No. W911S225PA259 | ) |

APPEARANCE FOR THE APPELLANT:      Mr. Basit Sahibzada
                                                   Managing Member


APPEARANCES FOR THE GOVERNMENT:   Dana J. Chase, Esq.
                                                 Army Chief Trial Attorney
                                                 CPT Amber L. Bunch, JA
                                                 Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MCLISH
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Appellant Vision Distributors LLC (Vision Distributors) appeals from a contracting officer's final decision terminating for cause a contract for the delivery of testing equipment. The Army filed a motion for summary judgment, contending that the undisputed facts establish that Vision Distributors anticipatorily repudiated the contract and its inability to perform was not excusable. We grant the motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. On April 22, 2025, the Army awarded Vision Distributors Contract No. W911S2-25-P-A259, a small business set-aside for the delivery of three Quaestor 8000s (R4, tab 1 at 1-2; gov't mot.; ex. G-1 ¶ 4)[1]. The Quaestor 8000 is "testing equipment designed for testing respiratory protection products" (gov't mot., ex. G-1 at ¶ 4) and is manufactured by Draeger, Inc.[2] (Draeger) (R4, tab 4 at 1). Delivery was to be on or before May 27, 2025, at Fort Leonard Wood, MO (R4, tab 1 at 5-6).

2. The contract incorporated by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL PRODUCTS AND COMMERCIAL SERVICES (Nov 2023) (R4, tab 1 at 1, 8).

---

[1] The government numbered its pages in its Rule 4 submission with leading zeros, which we omit here.

[2] We adopt the name and spelling used by the company's Sales Manager for USA Government & Defense in an email to Vision Distributors (R4, tab 4 at 1).

3.  FAR 52.212-4(m) provides that the government may terminate the contract for cause if "the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance" (R4, tab 1 at 8).

4.  FAR 52.212-4(f) provides that the contractor is relieved of liability for default if:

> nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either is sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.

(R4, tab 1 at 8).

5.  The Army Mission and Installation Contracting Command at Fort Drum, NY emailed the contract to Vision Distributors for its review and signature on April 22, 2025 (R4, tab 3 at 10).  The next day, Vision Distributors responded:

> Sorry for the delay in signing the contract but, we have scheduled a meeting for tomorrow with representatives from Dreager.  The primary objectives of this meeting are to obtain confirmation regarding the lead time and to ensure that the pricing remains consistent, particularly in light of the recent tariff increases that may have impacted costs.  This will help us ensure if any price changes may be needed.
>
> Upon satisfactory confirmation, the contract will be signed.

(*Id.* at 9)

6.  On April 24, 2025, Vision Distributors emailed the Army again, stating that Draeger had informed it of a price increase for the Quaestor 8000 due to recently implemented tariffs.  Noting that this price increase would result in a loss on the contract, Vision Distributors requested an increase in the contract price.  (*Id.* at 8-9)

7.  On April 25, 2025, an Army contracting officer responded by email and advised that a price change was not possible.  The email stated "[t]herefore, you would need to proceed at the originally contracted price, or we can discuss the possibility of

2

contract cancellation . . . ." Later that day, Vision Distributors responded that it would be signing the contract and forwarded the signed contract to the Army. (*Id.* at 6-8)

8. During an email exchange on April 29, 2025, Vision Distributors confirmed that "we will be going ahead with this PO" (*id*. at 4). On May 1, the Army sought confirmation that Vision Distributors would deliver the items by May 27. Vision Distributors responded "[w]e will have more information about the lead time tomorrow. We have placed our order and just waiting for confirmation." (*Id*. at 3)

9. The Army inquired again about the delivery on May 7. Later that day, Vision Distributors responded that "[a]fter confirming everything, 2 of the units are being manufactured and being delivered from Germany" and went on to predict delivery the week of June 9, 2025. (*Id.* at 2)

10. In an email to the Army purchasing agent on May 9, 2025, Vision Distributors stated "[w]e regret to inform you that we are unable to fulfill the referenced Purchase Order." The reason given for the inability to perform was that Draeger "has declined to permit us to procure their products due to our association with this particular order." After noting that Vision Distributors had lost money on the contract, the email indicated that Vision Distributors' efforts to change Draeger's position had been fruitless and opined that Draeger "appears to be pursuing a monopolistic approach." It further stated:

> Despite our proactive measures, such as placing and confirming orders well in advance to ensure timely delivery, Drager [*sic*] has instructed its resellers not to supply our organization. For your review, we have attached confirmation documents illustrating our preparedness and commitment to fulfilling this contractual obligation.
>
> Please be assured that we have made every possible effort to meet the terms of this order, and we sincerely apologize for any disruption this situation may cause.

(R4, tab 3 at 1)

11. Three documents were attached to Vision Distributors' May 9, 2025 email. First was a May 9, 2025 email from Draeger to Vision Distributors stating "[a]gain, you have been informed verbally and by email that I will not authorize this sale to you" and directing Vision Distributors to stop requesting quotes from it or its sales channel partners (R4, tab 4). Second was an April 30, 2025 email from The Safety Equipment Store reflecting that Vision Distributors had placed an order for two

3

Quaestor 8000s for $20,000 each (R4, tab 5). Third was an April 28, 2025 email from JJS Technical Services reflecting that Vision Distributors had placed an order for two Quaestor 8000s, also for $20,000 each (R4, tab 6).

12. On May 12, 2025, the Army's contracting officer emailed Vision Distributors stating that its May 9 statement that it could not fulfill the contract was an anticipatory breach and that termination for cause would need to be initiated. The contracting officer asked Vision Distributors to "advise if there are any additional considerations before formalizing this termination" and proceeded to note some of the potential negative consequences of a termination for cause. (R4, tab 7) In a declaration, the contracting officer states that he intended to give Vision Distributors "an opportunity to explain the situation and determine whether adequate assurance of performance could be provided or whether factors existed that might constitute an excusable delay" (gov't mot., Ex. G-1 at 6).

13. Vision Distributors did not respond to the contracting officer's May 12 email (*id.* at ¶ 7).

14. On May 15, 2025, the government notified Vision Distributors that the contract was terminated for cause due to the failure to deliver in accordance with the terms and conditions of the contract and provided a signed termination notice. The contracting officer's letter notified Vision Distributors of its right to appeal. (R4, tabs 8-10)

15. On July 30, 2025, Vision Distributors appealed to the Board. The notice of appeal stated that it was unable to perform due to "supplier interference and anti-competitive conduct, not because of any fault or negligence on our part." It added that its inability to perform was "entirely the result of a supplier's improper efforts to monopolize access to government contracts—not a failure on our part."

16. On December 15, 2025, appellant filed its complaint with the Board, in which it alleged that its inability to perform was excusable because it "resulted solely from manufacturer interference, anti-competitive conduct, post-award supplier restrictions, and market conditions that changed drastically after award" (Compl. ¶ 1).

DECISION

I.      **Standard of Review**

Summary judgment will be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *First Com. Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003). The party seeking summary judgment bears the initial burden to establish the absence of any genuine issues of

4

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Our task at this stage is not "'to weigh the evidence and determine the truth of the matter', but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. *Frankel v. United States*, 842 F.3d 1246, 1249-50 (Fed. Cir. 2016) (quoting *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994)).

## II.     The Undisputed Facts Demonstrate that Vision Distributors Defaulted

The government bears the burden to prove that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764-65 (Fed. Cir. 1987); *Cutter Enters, LLC,* ASBCA No. 61020 *et al.*, 26-1 BCA ¶39,002 at 189,918. If the government meets its burden to demonstrate that the contractor was in default, the burden shifts to appellant to demonstrate that the nonperformance was excusable or was caused by the government's material breach, or that the termination decision was arbitrary, capricious, or an abuse of discretion. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996); *Consorzio Stabile Gmg S.c.ar.l.*, ASBCA No. 62753, 23-1 BCA ¶ 38,347 at 186,213.

On the undisputed facts, the government has met its burden to show that the termination was justified by Vision Distributors' unequivocal statement that it was unable to perform and its subsequent silence when the contracting officer informed it that termination would be the result (SOF ¶¶ 10, 12-13). Termination for default is appropriate where the contractor expressly refuses to perform or states an inability to perform. *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1339-40 (Fed. Cir. 2000) (holding that the failure to provide assurances of performance is a breach justifying termination for default); *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293 (Fed. Cir. 1985); *see also United Healthcare Partners, Inc.*, ASBCA No. 58123, 16-1 BCA ¶ 36,374 at 177,314 (whether a contractor anticipatorily repudiated the contract is a legal determination susceptible to summary judgment).

Vision Distributors' May 9, 2025 email was a clear and unequivocal statement that it could not and therefore would not deliver the Quaestor 8000s as required by the contract. Nothing in the email suggested that Vision Distributors might still be able to perform. To the contrary, it reported that it had already made every possible effort to perform. (SOF ¶ 10) There is no way to read the May 9, 2025 email as anything other

5

than a "positive, definite, unconditional, and unequivocal manifestation of intent . . . on the part of [the] contractor. . . not to render the promised performance when the time fixed . . . by the contract shall arrive." *Cascade Pac.,* 773 F.2d at 293 (quoting *Mission Valve and Pump Co. v. United States,* ASBCA Nos. 13552, 13821, 69-2 BCA ¶ 8010 at 37,243 (1969)).

Accordingly, the burden shifts to Vision Distributors to demonstrate that its default was excusable.

### III.    The Undisputed Facts Demonstrate that Vision Distributors' Default Was Not Excusable

Vision Distributors has not demonstrated that there are any facts upon which a factfinder could conclude that its nonperformance was excusable. To show that its default was excusable, Vision Distributors must demonstrate that its inability to perform was caused by an occurrence beyond its reasonable control and without its fault or negligence. FAR 52.212-4(f).

Vision Distributors contends that Draeger's refusal to allow it to purchase Quaestor 8000s was beyond its control and not due to its fault or negligence. It asserts that it "had confirmed pricing with an authorized [Draeger] distributor before bidding, placed orders with two authorized distributors after award, paid for those orders, and received a delivery confirmation" before Draeger announced that it would not allow Vision Distributors to purchase the product. (App. opp'n at 9-10)

Assuming these factual assertions are true, they do not establish that the default was excusable. The reason Vision Distributors found itself unable to deliver the Quaestor 8000s was that it did not secure a binding, enforceable commitment from a supplier to provide the units before it entered into the contract. Before bidding on the contract, it only "confirmed pricing" with an authorized distributor (*id*. at 9). That pricing was not firm, as shown by the price increases that followed the imposition of tariffs. By failing to obtain a firm supplier agreement before signing the contract, Vision Distributors assumed the risk that it would be unable to obtain the units. After signing the contract, Vision Distributors placed and paid for orders, but its would-be suppliers failed to deliver the units, apparently at the direction of Draeger, the manufacturer (SOF ¶¶ 7-8, 10). "A contractor has the responsibility to investigate sources of supply and delivery terms prior to submitting its bid," and "every reasonably prudent contractor prior to bidding should obtain assurance that the materials needed to complete the work in accordance with the contract terms will be furnished." *Eppco Metals Corp.*, 90-1 BCA ¶ 22,349 at 112,304 (quoting *B & H Constr. Co.,* ASBCA Nos. 24558, 24587, 80–2 BCA ¶ 14,568 at 71,841).

6

Vision Distributors was not an authorized reseller of Draeger products and there is no evidence that it conducted any pre-bid research to determine if Draeger would nonetheless allow Vision Distributors to purchase its products for resale to the government.[3] In these circumstances, the risk that it would be denied authorization to resell the items to the government was on Vision Distributors and its failure to account for that risk does not make its default excusable. Obtaining an enforceable supplier commitment was not outside Vision Distributors' control and its failure to do so cannot be said to be without its fault or negligence. *See Dace Enters., LLC*, ASBCA No. 57984, 13-1 BCA ¶ 35,451 at 173,846-47 (default not excusable where contractor was unable to perform because it was not an authorized reseller of the brand name services required by the contract). *See also Gen. Injectables & Vaccines, Inc. v. Gates*, 527 F.3d 1375, 1379 (Fed. Cir. 2008) ("It would seem that the very essence of the promise of a contract to deliver articles is to procure or make them . . . and a delay resulting from the absence of such ability . . . is not a cause extraneous to it and independent of the engagements and exertions of the parties.") (quoting *Carnegie Steel Co. v. United States,* 240 U.S. 156, 164-66 (1916)).[4]

Notably, even if Vision Distributors had entered into an enforceable agreement with a supplier to provide the units, the supplier's unexcused failure to perform would not make Vision Distributors' default excusable. *Gen. Injectables & Vaccines,* 527 F.3d at 1378 ("the default rule [is that], absent contractual language to the contrary, . . . contractors are bound by the unexcused nonperformance of their

---

[3] In its brief, Vision Distributors states that Draeger "had previously declined Vision Distributors' application to become a channel partner" (app. opp'n at 9), but does not say whether this occurred before or after contract award. Either way, this admission undermines its excusability argument. If before, Vision Distributors was on notice when it entered into the contract to supply Draeger's products to the government that Draeger might decline to allow it to resell its products. If after, it shows that Vision Distributors' pre-bid efforts to ensure it would be able to perform were inadequate.

[4] Vision Distributors suggests that Draeger's actions made performance "impossible" (app. opp'n at 7), but presents no evidence that the elements of impossibility are met here. To demonstrate impossibility, Vision Distributors would need to show (1) a supervening event made performance impracticable; (2) the non-occurrence of that event was a basic assumption of the contract; (3) the event was not the contractor's fault; and (4) the contractor did not assume the risk. *Seaboard Lumber Co. v United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002). There is no evidence, such as a declaration from Vision Distributors, that it did not and could not have foreseen that Draeger would decline to allow Vision Distributors to resell its products to the government even though it was not an authorized reseller. In any event, as noted, under this supply contract the risk of this was on Vision Distributors.

7

subcontractors"). Instead, its recourse would be against the non-performing supplier. *See Supplycore, Inc.*, ASBCA No. 63057, 22-1 BCA ¶ 38,195 at 185,489 ("If [the subcontractor] breached the contract, [the prime contractor] should sue [the subcontractor].") (quoting *Gen. Ship Corp. v. United States*, 634 F. Supp. 868, 870 (D. Mass. 1986)). This is true even when the contract specifies a sole source. *Id.* at 185,488 (citing cases); *Metro Mach. dba Gen. Dynamics Nassco-Norfolk*, ASBCA No. 62221, 22-1 BCA ¶ 38,096 at 185,013 ("[w]e consider the law clear that when the Government directs use of a sole source it represents only that the requirement of the contract can be met by use of the item and not that the item will be properly manufactured or delivered on time . . . If appellant suffered damages as a result of the late delivery or improper manufacture ... its recourse is against [the sole-source supplier], not the Government") (quoting *Alabama Dry Dock & Shipbuilding Corp.*, ASBCA No. 39215, 90-2 BCA ¶ 22,855 at 114,811-12). We see no reason that a default should be inexcusable when the contractor obtained a binding commitment from a supplier, but excusable when the contractor did not. *See DCX*, 79 F.3d at 134 (upholding termination for default where failure to perform was attributable to contractor's own negligence because it did not obtain subcontract until after contract award, did not obtain subcontractor's firm commitment to completion date and had no backup arrangements in the event the subcontractor failed to perform).

Vision Distributors also argues that its default is excusable because the government failed to conduct adequate pre-award research under FAR 10.001 (app. opp'n at 10-11). Vision Distributors cites no authority for the proposition that the government breaches a duty to the contractor if it does not conduct pre-award market research to assess whether the contractor will be able to perform. To the contrary, the general rule is that "the obligation to locate a supplier remains where that sort of obligation has traditionally rested – upon the contractor." *Tulsa Mid-West Constr. Co.,* ASBCA No. 53594, 04-2 BCA ¶ 32,634 at 161,478 (quoting *Franklin E. Penny Co. v. United States*, 524 F.2d 668, 675 (Ct. Cl. 1975). "Thus, the burden of determining the availability of a product needed for contract performance is ordinarily placed upon the party promising to provide it." *Id.* (citing *WRB Corp. v. United States*, 183 Ct. Cl. 409, 510-12 (1968). While the risk of unavailability may fall upon the government if it contributed to or knew of the item's unavailability, *Aerodex, Inc. v. United States*, 417 F.2d 1361 (Ct. Cl. 1969), Vision Distributors has presented no evidence that that may have been the case here. Accordingly, there are no triable issues of fact as to the contention that the government breached the contract by failing to conduct market research.

Finally, Vision Distributors argues that fact issues exist as to whether the government withheld superior knowledge of Draeger's "distribution restrictions" (app. opp'n at 9-10). Vision Distributors presents no evidence that the government had, much less withheld, any relevant knowledge about Draeger's sales practices nor that any such information was not readily obtainable. *See Sage Acquisitions LLC*

8

*v. Sec'y of Hous. & Urb. Dev.,* 119 F.4th 973, 984 (Fed. Cir. 2024) (government not liable where alleged superior knowledge was "readily obtainable" by bidder before it entered into contract); *Giesler v. United States*, 232 F.3d 864, 877 (Fed. Cir. 2000) (superior knowledge doctrine inapplicable where contractor could have "readily obtained" the undisclosed information); *ACC Constr. Co.,* ASBCA Nos. 62265, 62937, 22-1 BCA ¶ 38,194 at 185,481 (as a corollary to the superior knowledge rule, the government is under no duty to volunteer information which the contractor can reasonably be expected to seek out himself). More fundamentally, Vision Distributors cannot seriously maintain that it had no reason to investigate whether Draeger would object to its resale of Draeger products to the government even though it was not an authorized reseller. *See Giesler*, 232 F.3d at 876 (superior knowledge doctrine applies where, among other things, the contractor "had no reason to obtain" the withheld information and the contract "did not put it on notice to inquire"). Indeed, the undisputed fact that Vision Distributors learned of Draeger's position on its own after contract award compels the conclusion that it could have learned it before contract award had it conducted an adequate inquiry.[5]

---

[5] To the extent Vision Distributors argues that it is entitled to conduct discovery into whether the government had superior knowledge, it has made no effort to comply with the requirements of FED. R. CIV. P. 56(d), which include the submission of an affidavit or declaration identifying what probable facts are not available and what steps have been taken to obtain them. *Odyssey Int'l, Inc.*, ASBCA Nos. 62062, 62279, 21-1 BCA ¶37,902 at 184,071. In any event, no discovery was necessary for Vision Distributors to present evidence that it could not have readily obtained the information it says the government should have disclosed. *See Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 23-1 BCA ¶ 38,373 at 186,405-06 (because the discovery sought could not change the results, no basis for requiring discovery before deciding summary judgment motion).

## CONCLUSION

For the reasons stated above, we grant the government's motion for summary judgment. The appeal is denied.

Dated: July 17, 2026

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64357, Appeal of Vision Distributors LLC, rendered in conformance with the Board's Charter.

Dated: July 17, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

10